UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Case No. _____

EDWARD J. MYLETT III; KRISTIANNA
MYLETT; FLS BUSINESS CENTER, LLC;
AND 4315 PINE WARBLER PROPERTIES
LLC,

          Plaintiffs,

vs.

MATTHEW ONOFRIO AND
NORTHWOODS MANAGEMENT LLC,

          Defendants.

**COMPLAINT**

**DEMAND FOR JURY TRIAL**

## INTRODUCTION

1.     When Defendant Matthew Onofrio ("Onofrio") contacted Plaintiffs Edward and Kristianna Mylett (individually, "Ed Mylett" and "Kristianna Mylett," and collectively, the "Myletts") with an incredible opportunity, the Myletts believed that Onofrio was going to help them with a profitable real estate investment. Onofrio held himself out as an experienced investor and offered to broker the sale of two commercial properties in Georgia, one located at 4305 Mercer University Drive, Macon, GA 31206 and the other at 1280 Gray Highway, Macon, GA 31211 (collectively, the "Properties"). However, the Myletts eventually discovered the realities of the deal. The Properties were not worth what Onofrio represented and did not deliver the financial benefits that Onofrio promised.

2.      Defendants, using a holding company, entered into an agreement with the seller of the Properties, SED-Mercer, LLC and SED-Gray, LLC, to purchase the Properties for $9,146,809. Using the holding company, 4315 Pine Warbler Properties LLC, Defendants closed on the sale of the Properties, for the purchase price of $9,146,809, and 14 days later sold the "membership interest" in 4315 Pine Warbler Properties LLC to the Myletts for $12,200,000. The only asset of the holding company was ownership interest in the Properties. Defendants hoodwinked Plaintiffs into purchasing the Properties for $3.1 million more than they were worth. Defendants wrongfully and intentionally profited off the difference.[1]

3.      Defendants provided what Onofrio termed as "down payment assistance" of $1.25 million to Plaintiffs to help finance their acquisition of the Properties. In return, Plaintiffs executed a promissory note ("Note"), a personal guaranty (the "Personal Guaranty"), and security deed (the "Security Deed") on the Properties.[2] Under the Note, Plaintiffs are required to pay Northwoods Management LLC monthly interest payments for the first five years, followed by a balloon payment for the outstanding principal balance.

4.      Onofrio pushed the Myletts into this purchase with grand promises of the deal of a lifetime. The reality, though, was that Defendants were the ones assured to make money on the deal, not the Plaintiffs.

5.      After Plaintiffs closed on the Properties, the Myletts learned that Onofrio was

---

[1] Plaintiffs Ed Mylett, Kristianna Mylett, FLS Business Center, LLC, and 4315 Pine Warbler Properties, LLC are referred to collectively in the Complaint as the "Plaintiffs."
[2] The Note, Personal Guaranty, and Security Deed are attached to this Complaint as **Exhibits A, B, and C**, respectively.

indicted for bank fraud for employing the similar fraudulent real estate schemes he used against the Plaintiffs. In the indictment, Onofrio was accused of convincing buyers to purchase properties at inflated prices, while he already had the properties under contract at lower prices. He would help the buyers secure financing using appraisals with inflated values and offer to cover a portion of the payment himself, in exchange for monthly payments from the buyers. This allowed Defendants to profit from the price difference while putting the buyers at risk of financial ruin. Onofrio pled guilty to the bank fraud on July 10, 2023.

6.     Onofrio wanted to get rich from defrauding others, but the law protects innocent parties from schemers like Onofrio. Onofrio fraudulently induced Plaintiffs into executing the purchase agreement for membership interests in 4315 Pine Warbler Properties LLC (the "Membership Purchase Agreement"),[3] Note, Personal Guaranty, and Security Deed, and thus the agreements are voidable. Further, Onofrio is liable to the Plaintiffs for their losses incurred because of this transaction and through the Properties.

## **PARTIES**

7.     Plaintiffs Ed Mylett and Kristianna Mylett are residents of the State of California.

8.     Plaintiff FLS Business Center, LLC is an Idaho limited liability company with its principal office located at 4195 Chino Hills Parkway, Chino Hills, CA 91709. The sole members of FLS Business Center, LLC are the Myletts.

---

[3] The Membership Purchase Agreement is attached to this Complaint as **Exhibit D**.

9.     Plaintiff 4315 Pine Warbler Properties LLC is a Minnesota limited liability company with its principal office located at 4195 Chino Hills Parkway, E513, Chino Hills, CA 91709. The sole member of 4315 Pine Warbler Properties LLC is FLS Business Center, LLC.

10.     Upon information and belief, Defendant Onofrio is a resident of the State of Wisconsin and resides at 2602 Jeanne Lane, Eau Claire, WI 54703.

11.     Upon information and belief, Defendant Northwoods Management LLC is a Minnesota limited liability company with its registered office located at 1530 Greenview Dr. SW, Suite 21, Rochester, MN 55902. The sole member of Northwoods Management LLC is Defendant Onofrio, who is a resident of Wisconsin.

## JURISDICTION AND VENUE

12.     Jurisdiction and venue are proper in this Court.

13.     This Court has subject matter jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1332(a)(1) based upon diversity of citizenship, as no Defendant holds citizenship in the same state where Plaintiffs hold citizenship and the amount in controversy exceeds $75,000.

14.     Plaintiffs are citizens of California. The Myletts are citizens of California, and the sole members of FLS Business Center, LLC. FLS Business Center, LLC is the sole member of 4315 Pine Warbler Properties LLC. A limited liability company's citizenship, for purposes of diversity jurisdiction, is the citizenship of each of its members. *OnePoint Solutions, LLC v. Borchert*, 486 F.3d 342, 346 (8th Cir. 2007).

15.     Defendants are citizens of Wisconsin. Upon information and belief, Onofrio

is a citizen of Wisconsin, and the sole member of Northwoods Management LLC.

16.     This Court has personal jurisdiction over Northwoods Management LLC because it is registered in Minnesota. It further consented to personal jurisdiction in Minnesota as a party to the Membership Purchase Agreement, the Note, and Personal Guaranty, which include provisions consenting to jurisdiction in Minnesota and selecting Minnesota as the choice of law to govern disputes arising out of the agreements.

17.     This Court further has personal jurisdiction over Defendants because they have sufficient minimum contacts with the State of Minnesota such that maintenance of the suit does not offend traditional notions of fair play and substantial justice. *Int'l Shoe Co. v. State of Wash., Off. of Unemployment Comp. & Placement*, 326 U.S. 310, 316 (1945).

18.     Defendants led and secured financing for Plaintiffs' purchase of the Properties with Key Community Bank (the "Bank"). The Bank's principal office is located at 5684 Bishop Ave., Inver Grove Heights, MN 55076. As part of these dealings, Defendants coordinated the Plaintiffs' financing through Onofrio's contact at the Bank. Defendants frequently interacted with the Bank, exchanged numerous emails and communications regarding the transaction, and acted on behalf of the Bank in setting up the financing for Plaintiffs.

19.     In addition to the specific facts giving rise to Plaintiffs' claims in this Complaint, Defendants maintained continuous and systematic contacts with the State of Minnesota through personal and business dealings. Defendants have executed numerous transactions for real estate located within Minnesota. Onofrio has frequently been present

5

in and spent significant time in Minnesota within the last few years. Onofrio registered Northwoods Management LLC, for which he is president and sole member, in Minnesota. He worked in Minnesota as recently as three years ago. Onofrio also was charged with and pled guilty to bank fraud in violation of 18 U.S.C. § 1344 in the United States District Court for the District of Minnesota.

20.     Defendants personally availed themselves of the privilege of conducting activities within Minnesota, thus invoking the benefits and protections of Minnesota law. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985). Based on these minimum contacts, Defendants could reasonably anticipate being hauled into a court in Minnesota, and this Court may exercise personal jurisdiction over Defendants. *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).

21.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) because Defendant Northwoods Management LLC resides in Minnesota. Under 28 U.S.C. § 1391(c)(2), a defendant company resides in a district when it is subject to the Court's personal jurisdiction. Venue is also proper under 28 U.S.C. § 1391(b)(2), in that a substantial part of the events or omissions giving rise to the claims occurred in this district.

## FACTS

### A.     The Myletts Meet Matthew Onofrio.

22.     Onofrio held himself out as an experienced real estate investor with an amazing track record. On one of his now-defunct investing websites "Wild Moose Ventures," he touted that:

Since 2019, he has done more than one hundred deals, and his personal

holdings have expanded significantly. From his hard earned experience in sourcing to financing and management to mindset, Matt shows how someone from a completely different field can thrive in commercial real estate, and he aims to break the stigma often associated with big commercial investing by making it accessible to investors of all levels.[4]

23.     On another defunct site, he claimed that:

Although Matt's background is in medicine as a nurse anesthesiologist, he has a deep understanding of commercial real estate focused on Triple Net Investing. It was here that he found that missing piece in his life. Through self-discipline, books, podcasts, mentorship, masterminds, and a lot of hard work, Matt is now closing 25 deals a quarter, totaling over $200M.[5]

24.     Indeed, Onofrio regularly courted aspiring real estate investors, claiming that he could help them achieve their dreams through real estate. As he stated on his website:

Matt's goal is to empower and educate more people to create passive wealth through commercial real estate investments and help to break the stigma often associated with big commercial deals. From financing, taxes, mentorships, and more, Matt shows how someone from a completely different field can thrive in commercial real estate.

As he grows his own portfolio, Matt also helps other investors become financially free and get into their own commercial real estate deals.[6]

25.     Onofrio was planning to publish a book explaining his experience in the real estate investing world, titled "Triple Net Investing."

26.     Onofrio also regularly appeared on investment podcasts, including "Bigger Pockets," which is a real estate investment podcast.

27.     Ed Mylett is a speaker, coach, entrepreneur, author, and host of the popular podcast "The Ed Mylett Show." Onofrio wanted to use Ed Mylett as a way to give himself

---

[4] https://wildmooseventures.com/about/.
[5] https://web.archive.org/web/20220310074649/https://mattonofrio.com/.
[6] https://web.archive.org/web/20220310074649/https://mattonofrio.com/.

credibility with potential victims due to Ed's notoriety. Ultimately, the Myletts became Onofrio's victims as well.

28.     Onofrio first reached out to Ed Mylett in the fall of 2021. Onofrio sought out contact with Ed Mylett through mutual acquaintances. Onofrio claimed to be a Christian businessman and sought coaching from Ed Mylett on account of their shared Christian faith. Onofrio paid for six months of coaching from Ed Mylett. Ed Mylett's first coaching session with Onofrio was in January 2022. From their first coaching session, Onofrio started to try to convince Ed Mylett to purchase real estate from him.

29.     Onofrio personally told Ed Mylett that he was the "#1 triple net expert in the world," and touted his popularity as a real estate investor by claiming to "get hundreds of direct messages on my Instagram a month in my emails from buyers who want to buy properties for me if I can find them deals."

30.     Onofrio explained to Ed Mylett that "because of my public profile as the expert on triple net investing, I get approached with deals that nobody else has access to all over the country."

31.     Onofrio even used Ed Mylett's Christian faith as a way to manipulate him into purchasing the Properties. Onofrio claimed that "as a Christian," he had "a higher level of responsibility to act ethically and morally on all [his] business dealings."

**B. Onofrio Convinces the Myletts to Purchase the Properties and Controls Every Aspect of the Deal.**

32.     Prior to the sale of the Properties to the Myletts, Defendants entered into an agreement to sell the Properties to an unrelated third party. In connection with that deal,

Defendants obtained appraisals for the Properties, which misleadingly overvalued the Properties at $12.2 million – over $3 million more than Defendants intended to pay for the Properties. Ultimately, the deal fell through, and Defendants needed to act quickly to find another buyer.

33.     On February 4, 2022, Onofrio emailed Ed Mylett representing that he had an exciting new opportunity to sell the Properties with each having separate triple net leases with Walgreens. Onofrio provided Ed Mylett with copies of two misleading appraisals that overvalued the Properties and a bank financing proposal term sheet.

34.     Onofrio represented to the Myletts that "because I am national supplier of these deals, I get pitched the best deals at the best prices, in the best markets," and when those deals come along, "I pass them along to my investors." Onofrio assured the Myletts, "I am so confident about this deal, if you're not happy with [the Properties] in a year, I will take them back from you."

35.     Onofrio also assured the Myletts of the financial strength of the deal, asserting that they would be "buying the properties significantly under the market price because of my buying power," that he had "found the most incredible deal possible for you," and that of all the deals he had been sent that year, "this one is the best with the most upside."

36.     Onofrio held out that he was offering this deal to the Myletts because of the coaching Onofrio received from Ed Mylett. Onofrio represented to Ed Mylett, "I do special deals for friends and family that I don't do for the general public" and "because you're coaching me and you make such a huge difference in my life, I'm going to pass this deal

on to you."

37.     Onofrio marketed the sale to the Myletts as a "package deal" with all the financing already in place and "approved for 80/10/10" while asserting that the Bank was willing to finance a 90/10 loan.

38.     Onofrio insisted that the Myletts use one of Onofrio's personal contacts at the Bank to finance the purchase of the Properties.

39.     Onofrio controlled the lending process with the Bank and was the main point of contact between the Bank and the Myletts.

40.     Unbeknownst to Plaintiffs, on February 22, 2022, Defendants purchased the Properties for $9,182,809 using the holding company, 4315 Pine Warbler Properties LLC.

41.     On March 1, 2022, Onofrio's company, Northwoods Management LLC, entered into the Membership Purchase Agreement with the Myletts' company, FLS Business Center, LLC, to sell the Properties to Plaintiffs for $12.2 million.

42.     The Myletts had almost no interaction with the Bank throughout the financing process. On February 24, 2022, Onofrio's contact at the Bank sent Onofrio an email with an update on the approval process stating that, "Sooner rather than later, they want me to speak with Ed [Mylett] directly." Although Onofrio was pushing the deal to close the following week, the Myletts still had not even had one conversation with the Bank about their financing or the transaction.

43.     On March 7, 2022, Defendants had Plaintiffs sign the Note agreeing to pay Northwoods Management LLC $1.25 million. The Note was secured with the Personal Guaranty from Ed Mylett and the Security Deed on the Properties. Notably, Onofrio told

Ed Mylett by email that same day that "Wes [Beedon from the Bank] is emailing you the loan docs now." Onofrio then sent Ed Mylett "second mortgage docs" for execution—with the Bank copied.

44.     Onofrio pushed the Myletts to finalize the deal, stating that "All docs need to be signed today, notarized, and overnighted to Title" despite Ed Mylett informing Defendants and the Bank that he and his wife had a busy day that would not be conducive to signing absent a mobile notary arriving at their home.

45.     Plaintiffs signed the loan documents for the Bank and Northwoods Management LLC on March 7, 2022.

46.     On March 8, 2022, Plaintiffs closed on the Membership Purchase Agreement. The only asset of 4315 Pine Warbler Properties LLC was its ownership interest in the Properties.

**C.     The Properties Do Not Perform as Promised.**

47.     Following closing on the Properties, Plaintiffs realized that the value of the Properties had been significantly overinflated.

48.     Despite Onofrio's claims that the "value of the properties is so much higher than you're paying," Ed Mylett found out from one of the listeners of his podcast who reached out directly to inform him that Plaintiffs had been swindled by Defendants.

49.     Upon learning this information, Ed Mylett reached out to Onofrio personally to find out if there was any truth to the report that Defendants had sold Plaintiffs overvalued Properties for Defendants' personal gain. Unsurprisingly, Onofrio refused to return Ed Mylett's calls and text messages.

50.     A third-party review of the appraisals that Onofrio sent to Ed Mylett showed that the appraisals inflated the value of the Properties. The appraisals assigned an arbitrary and significantly inflated cap rate to the Properties that was unsupported by any objective facts and contradicted by the data included in the appraisals themselves. The appraisals also misleadingly described some of the "comparable" sales.

51.     Since closing, the Properties have experienced numerous financial setbacks due to the overinflated value of the Properties.

**D. Onofrio is Indicted and Pleads Guilty to Federal Bank Fraud using a Similar Fraudulent Scheme He Employed against the Myletts.**

52.     On or about November 17, 2022, Onofrio was indicted for bank fraud with allegations that he engaged in a concerted effort to defraud numerous people and banks.

53.     The indictment charged Onofrio with using his company, Northwoods Management LLC, to commit fraud in connection with the sale and purchase of various properties, including by using "altered purchase agreements and inflated appraisals." *U.S. v. Matthew Thomas Onofrio*, Case No. 22-CR-00322-SRN-TNL (D. Minn. 2022).

54.     The indictment explained that Onofrio used his investment "credentials" to convince buyers to purchase properties at inflated prices, even though he had already purchased them at significantly lower prices. He would then help the buyers secure financing based on the higher prices and offer to cover the down payment himself, in exchange for monthly repayments with interest, allowing him to profit from the price difference and put the buyers at risk of financial strain.

55.     On July 10, 2023, Onofrio pled guilty to federal bank fraud in connection

with his real estate investing scheme and faces up to 13 years in prison.

56.     Onofrio applied similar tactics to the ones described in the indictment to convince Plaintiffs to purchase the Properties. Specifically, Onofrio obtained and used appraisals that overvalued the Properties to fraudulently convince Plaintiffs to purchase the Properties for a higher price than they were worth, made numerous false representations about the success of the Properties, and lied about the financial benefits Plaintiffs would receive from the Properties. In addition, Defendants loaned Plaintiffs $1.25 million to cover a portion of the purchase price that was secured by the Personal Guaranty and the Security Deed on the Properties.

57.     Defendants profited over $3 million from the difference in purchase price in the Properties from when Defendants purchased them on February 22, 2022, to when Defendants sold them to Plaintiffs on March 8, 2022.

## LEGAL CLAIMS

### COUNT I
### Declaratory Judgment that the Note is Void
### Northwoods Management

58.     Plaintiffs incorporate all paragraphs above as if fully restated herein.

59.     Courts may determine rights, status, and other legal relations of parties to a contract. Minn. Stat. § 555.01, *et seq*.

60.     A contract that a party is fraudulently induced to enter into is voidable.

61.     The elements for fraudulent inducement are: (1) the defendant made a false representation of fact; (2) the defendant either knew the representation was false or asserted it as his own knowledge without knowing whether it was true or false; (3) the defendant

intended the plaintiff to rely on the representation; (4) the plaintiff was induced to act based on the representation; and (5) the false representation proximately caused damage to the plaintiff. *Id.*

62.    Defendants made numerous false representations of fact as set forth in this Complaint, including representing that Plaintiffs would be purchasing the Properties significantly under the fair market value because of Defendants' buying power, supplying misleading appraisals that intentionally overvalued the Properties to convince Plaintiffs to purchase the Properties, and representing that the value on the Properties was much higher than what Plaintiffs were paying.

63.    Onofrio falsely represented to Plaintiffs, "I am so confident about this deal, if you're not happy with [the Properties] in a year, I will take them back from you." Onofrio further persuaded Plaintiffs that "as a Christian," he had "a higher level of responsibility to act ethically and morally on all [his] business dealings."

64.    Defendants also made false representations of fact about Onofrio's expertise in real estate investing, claiming he was the "#1 triple net expert in the world."

65.    Defendants knew the representations were false, in that the Properties were significantly overvalued and that the appraisals were false and misleading.

66.    Defendants intended Plaintiffs to rely on the false representations of fact to convince Plaintiffs to purchase the Properties and enter into the Membership Purchase Agreement, Note, Personal Guaranty, and Security Deed.

67.    Plaintiffs were induced to enter into the Membership Purchase Agreement, Note, Personal Guaranty, and Security Deed based on Defendants' false representations of

fact.

68.     Defendants' false representations of fact proximately caused the Plaintiffs' damages. Without Defendants' false representations of fact, Plaintiffs would not have entered into the Membership Purchase Agreement, Note, Personal Guaranty, and Security Deed.

69.     An actual and substantial controversy exists between Plaintiffs and Defendants as to their respective legal rights and duties under the Note.

70.     This Court should resolve this controversy and afford Plaintiffs relief by declaring that the Note is void.

## COUNT II
### Declaratory Judgment that the Personal Guaranty is Void
### Northwoods Management

71.     Plaintiffs incorporate all paragraphs above as if fully restated herein.

72.     Courts may determine rights, status, and other legal relations of parties to a contract. Minn. Stat. § 555.01, *et seq*.

73.     A contract that a party is fraudulently induced to enter into is voidable.

74.     The elements for fraudulent inducement are: (1) the defendant made a false representation of fact; (2) the defendant either knew the representation was false or asserted it as his own knowledge without knowing whether it was true or false; (3) the defendant intended the plaintiff to rely on the representation; (4) the plaintiff was induced to act based on the representation; and (5) the false representation proximately caused damage to the plaintiff.

75.     Defendants made numerous false representations of fact as set forth in this

Complaint, including representing that Plaintiffs would be purchasing the Properties significantly under the fair market value because of Defendants' buying power, supplying misleading appraisals that intentionally overvalued the Properties to convince Plaintiffs to purchase the Properties, and representing that the value on the Properties was much higher than what Plaintiffs were paying.

76.     Onofrio falsely represented to Plaintiffs, "I am so confident about this deal, if you're not happy with [the Properties] in a year, I will take them back from you." Onofrio further persuaded Plaintiffs that "as a Christian," he had "a higher level of responsibility to act ethically and morally on all [his] business dealings."

77.     Defendants also made false representations of fact about Onofrio's expertise in real estate investing, claiming he was the "#1 triple net expert in the world."

78.     Defendants knew the representations were false, in that the Properties were significantly overvalued and that the appraisals were false and misleading.

79.     Defendants intended Plaintiffs to rely on the false representations of fact to convince Plaintiffs to purchase the Properties and enter into the Membership Purchase Agreement, Note, Personal Guaranty, and Security Deed.

80.     Plaintiffs were induced to enter into the Membership Purchase Agreement, Note, Personal Guaranty, and Security Deed based on Defendants' false representations of fact.

81.     Defendants' false representations of fact proximately caused the Plaintiffs' damages. Without Defendants' false representations of fact, Plaintiffs would not have entered into the Membership Purchase Agreement, Note, Personal Guaranty, and Security

Deed.

82.     An actual and substantial controversy exists between Plaintiffs and Defendants as to their respective legal rights and duties under the Personal Guaranty.

83.     This Court should resolve this controversy and afford Plaintiffs relief by declaring that the Personal Guaranty is void.

**COUNT III**
**Declaratory Judgment that the Security Deed is Void**
**Northwoods Management**

84.     Plaintiffs incorporate all paragraphs above as if fully restated herein.

85.     Courts may determine rights, status, and other legal relations of parties to a contract. Minn. Stat. § 555.01, *et seq*.

86.     A contract that a party is fraudulently induced to enter into is voidable.

87.     A security deed is void where the underlying promissory note is unenforceable.

88.     The elements for fraudulent inducement are: (1) the defendant made a false representation of fact; (2) the defendant either knew the representation was false or asserted it as his own knowledge without knowing whether it was true or false; (3) the defendant intended the plaintiff to rely on the representation; (4) the plaintiff was induced to act based on the representation; and (5) the false representation proximately caused damage to the plaintiff. *Id.*

89.     Defendants made numerous false representations of fact as set forth in this Complaint, including representing that Plaintiffs would be purchasing the Properties significantly under the fair market value because of Defendants' buying power, supplying

misleading appraisals that intentionally overvalued the Properties to convince Plaintiffs to purchase the Properties, and representing that the value on the Properties was much higher than what Plaintiffs were paying.

90.     Onofrio falsely represented to Plaintiffs, "I am so confident about this deal, if you're not happy with [the Properties] in a year, I will take them back from you." Onofrio further persuaded Plaintiffs that "as a Christian," he had "a higher level of responsibility to act ethically and morally on all [his] business dealings."

91.     Defendants also made false representations of fact about Onofrio's expertise in real estate investing, claiming he was the "#1 triple net expert in the world."

92.     Defendants knew the representations were false, in that the Properties were significantly overvalued and that the appraisals were false and misleading.

93.     Defendants intended Plaintiffs to rely on the false representations of fact to convince Plaintiffs to purchase the Properties and enter into the Membership Purchase Agreement, Note, Personal Guaranty, and Security Deed.

94.     Plaintiffs were induced to enter into the Membership Purchase Agreement, Note, Personal Guaranty, and Security Deed based on Defendants' false representations of fact.

95.     Defendants' false representations of fact proximately caused the Plaintiffs' damages. Without Defendants' false representations of fact, Plaintiffs would not have entered into the Membership Purchase Agreement, Note, Personal Guaranty, and Security Deed.

96.     An actual and substantial controversy exists between Plaintiffs and Defendants as to their respective legal rights and duties under the Security Deed.

97.     This Court should resolve this controversy and afford Plaintiffs relief by declaring that the Security Deed is void.

### COUNT IV
### Negligence
### Northwoods Management and Onofrio

98.     Plaintiffs incorporate all paragraphs above as if fully restated herein.

99.     The elements of negligence are: (1) the existence of a duty of care; (2) a breach of that duty; (3) an injury in fact; and (4) the breach of the duty of care being the proximate cause of the injury.

100.    Defendants owed Plaintiffs a duty of care because, although Defendants were not licensed as real estate brokers, they served in the capacity of a real estate broker in connection with Plaintiffs' purchase of the Properties. Real estate brokers owe their clients a duty of care. Further, Onofrio held himself out to Plaintiffs as an expert in real estate and took on the role of an adviser, advising Plaintiffs of the financial benefits associated with the purchase of the Properties, and brokering the transaction with the appearance of working on the Plaintiffs' behalf.

101.    Defendants also owed Plaintiffs a duty of care against false or reckless representations as a party to the transaction.

102.    Defendants breached that duty of care because Defendants were reckless in providing Plaintiffs with information about the Properties, including representing that Plaintiffs would be purchasing the Properties significantly under the fair market value

because of Defendants' buying power, supplying misleading appraisals that intentionally overvalued the Properties to convince Plaintiffs to purchase the Properties, and representing that the value on the Properties was much higher than what Plaintiffs were paying.

103.    Defendants' breach injured Plaintiffs and induced the Plaintiffs to purchase the Properties using Defendants' reckless and false projections about the value of and other information about the Properties. But for Defendants' actions, the Plaintiffs would not have purchased the Properties or entered into the Membership Purchase Agreement, Note, Personal Guaranty, and Security Deed.

104.    Plaintiffs were damaged by Defendants' representations because Plaintiffs purchased the Properties for well above their fair market value based upon their reliance on Defendants' representations.

105.    Due to Defendants' negligence, Plaintiffs are entitled to damages against Defendants in excess of $1,000,000, plus interest, costs, disbursements, and attorneys' fees, with the exact amount to be determined at trial.

**COUNT V**
**Negligent Misrepresentation**
**Northwoods Management and Onofrio**

106.    Plaintiffs incorporate all paragraphs above as if fully stated herein.

107.    The elements of negligent misrepresentation are: (1) defendant, in the course of his or her business, profession, or employment, or in a transaction in which he or she has a pecuniary interest; (2) supplies false information for the guidance of others in their business transactions; (3) plaintiff justifiably relies on the information; and (4) defendant

in making the representation has failed to exercise reasonable care in obtaining or communicating the information.

108.    Onofrio was acting in the course of his business, profession, or employment by holding himself out to an expert in the area of triple net investing. Defendants further had a pecuniary interest in the sale of the Properties for which they planned to profit in excess of $3 million.

109.    Defendants made numerous false representations of fact as set forth in this Complaint, including representing that Plaintiffs would be purchasing the Properties significantly under the fair market value because of Defendants' buying power, supplying misleading appraisals that intentionally overvalued the Properties to convince Plaintiffs to purchase the Properties, and representing that the value on the Properties was much higher than what Plaintiffs were paying.

110.    Onofrio falsely represented to Plaintiffs, "I am so confident about this deal, if you're not happy with [the Properties] in a year, I will take them back from you." Onofrio further persuaded Plaintiffs that "as a Christian," he had "a higher level of responsibility to act ethically and morally on all [his] business dealings."

111.    Defendants also made false representations of fact about Onofrio's expertise in real estate investing, claiming he was the "#1 triple net expert in the world."

112.    In addition, Defendants supplied the Plaintiffs with two appraisals conducted for a previous sale that significantly overvalued the Properties.

113.    Plaintiffs justifiably relied on the information Defendants provided because, although Defendants were not licensed as real estate brokers, they served in the capacity

of a real estate broker in connection with Plaintiffs' purchase of the Properties. Further, Onofrio held himself out to Plaintiffs as an expert in real estate and took on the role of an adviser, advising Plaintiffs in the financial benefits associated with the purchase of the Properties, and brokering the transaction with the appearance of working on the Plaintiffs' behalf.

114.    Defendants further failed to exercise reasonable care in communicating false information with Plaintiffs. Defendants supplied Plaintiffs with two appraisals that Defendants knew significantly overvalued the Properties. Despite Defendants' knowledge that the appraisals contained false and misleading information, Defendants convinced Plaintiffs to rely on the information contained in the appraisals to induce them to purchase the Properties and enter into the Membership Purchase Agreement, Note, Personal Guaranty, and Security Deed.

115.    Due to Defendants' negligent misrepresentation, Plaintiffs are entitled to damages against Defendants in excess of $1,000,000, plus interest, costs, disbursements, and attorneys' fees, with the exact amount to be determined at trial.

**COUNT VI**
**Intentional Misrepresentation**
**Northwoods Management and Onofrio**

116.    Plaintiffs incorporate all paragraphs above as if fully stated herein.

117.    The elements of fraudulent inducement are: (1) defendant made a false representation of fact; (2) defendant either knew the representation was false or asserted it as his own knowledge without knowing whether it was true or false; (3) defendant intended the plaintiff to rely on the representation; (4) plaintiff was induced to act based on the

representation; and (5) the false representation proximately caused damage to the plaintiff.

118.   Defendants made numerous false representations of fact as set forth in this Complaint, including representing that Plaintiffs would be purchasing the Properties significantly under the fair market value because of Defendants' buying power, supplying misleading appraisals that intentionally overvalued the Properties to convince Plaintiffs to purchase the Properties, and representing that the value on the Properties was much higher than what Plaintiffs were paying.

119.   Onofrio falsely represented to Plaintiffs, "I am so confident about this deal, if you're not happy with [the Properties] in a year, I will take them back from you." Onofrio further persuaded Plaintiffs that "as a Christian," he had "a higher level of responsibility to act ethically and morally on all [his] business dealings."

120.   Defendants also made false representations of fact about Onofrio's expertise in real estate investing, claiming he was the "#1 triple net expert in the world."

121.   In addition, Defendants supplied the Plaintiffs with two appraisals conducted for a previous sale that significantly overvalued the Properties.

122.   Defendants knew the representations were false, in that the Properties were significantly overvalued and that the appraisals were false and misleading. Defendants purchased the Properties for over $3 million less than the value of the Properties just days before Plaintiffs purchased the Properties from Defendants.

123.   Defendants intended Plaintiffs to rely on the false representations of fact to convince Plaintiffs to purchase the Properties and enter into the Membership Purchase Agreement, Note, Personal Guaranty, and Security Deed.

124.    Plaintiffs were induced to enter into the Membership Purchase Agreement, Note, Personal Guaranty, and Security Deed based on Defendants' false representations of fact.

125.    Defendants' false representations of fact caused the Plaintiffs' damages. Without Defendants' false representations of fact, Plaintiffs would not have entered into the Membership Purchase Agreement, Note, Personal Guaranty, and Security Deed.

126.    Due to Defendants' intentional misrepresentations, Plaintiffs are entitled to damages against Defendants in excess of $1,000,000, plus interest, costs, disbursements, and attorneys' fees, with the exact amount to be determined at trial.

**COUNT VII**
**Unjust Enrichment**
**Northwoods Management and Onofrio**

127.    Plaintiffs incorporate all paragraphs above as if fully stated herein.

128.    The elements of an unjust enrichment claim are: (1) a benefit is conferred by the plaintiff on the defendant; (2) the defendant accepted the benefit; and (3) the defendant retained the benefit although retaining it without payment is inequitable.

129.    Defendants received a benefit from Plaintiffs in the form of the monetary benefits they received from the sale of the Properties to Plaintiffs and payments made toward the Note.

130.    Defendants accepted the benefit by accepting funds from the sale of the Properties to Plaintiffs and payments on the Note.

131.    It would be inequitable for Defendants to retain the benefits of those payments because they were received as a result of fraudulent and/or negligent

24

misrepresentations made by Defendants, services that were illegal for Defendants to provide, a Note which was entered as a result of fraudulent and/or negligent misrepresentations, and for services and advice which were provided negligently.

132.    Under the doctrine of unjust enrichment, Plaintiffs are entitled to damages against Defendants in excess of $1,000,000, plus interest, costs, disbursements, and attorneys' fees, with the exact amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully ask this Court to award judgment as follows:

1.    On Count I, an order declaring that the Note is void;

2.    On Count II, an order declaring that the Personal Guaranty is void;

3.    On Count III, an order declaring that the Security Deed is void;

4.    On Counts IV-VII, awarding damages in favor of Plaintiffs in an amount to be determined at trial, but in no event less than $1,000,000, plus interest, costs, disbursements, and attorneys' fees; and

5.    Such other relief as this Court deems just and equitable.

**FAEGRE DRINKER BIDDLE & REATH LLP**

Dated: November 10, 2023    /s/ Cyri A. Van Hecke
                            Cyri A. Van Hecke (#0393029)
                            Allison J. Mitchell (#0402134)
                            2200 Wells Fargo Center
                            90 South Seventh Street
                            Minneapolis, Minnesota 55402-3901
                            Telephone: (612) 766-7000
                            cyri.vanhecke@faegredrinker.com
                            allison.mitchell@faegredrinker.com

                            **ATTORNEYS FOR PLAINTIFFS**