**EXHIBIT D**

Membership Purchase Agreement

## MEMBERSHIP INTEREST PURCHASE AGREEMENT

This **MEMBERSHIP INTEREST PURCHASE AGREEMENT** (this "**Agreement**") is made and entered into effective as of 3/1/2022 | 12:48 PM PST ("**Effective Date**"), by and among Northwoods Management LLC, a Minnesota limited liability company, ("**Seller**"), FLS Business Center, LLC, an Idaho limited liability company, (the "**Purchaser**"), and 4315 Pine Warbler Properties LLC, a Minnesota limited liability company (the "**Company**"). Seller, Purchaser, and the Company are referred to in this Agreement individually as a "**Party**" and collectively as the "**Parties**."

**WHEREAS**, the Company owns 100% fee simple interest in the property known as 4305 Mercer University Drive, Macon, GA 31206 and 1280 Gray Highway, Macon, GA 31211; and

**WHEREAS**, Seller desires to sell, transfer, and convey, and Purchaser desires to purchase and acquire, all of Seller's Membership interest in the Company for the consideration and on the terms and conditions set forth in this Agreement; and

**NOW, THEREFORE**, in consideration of the foregoing recited facts, the mutual terms, covenants, and conditions, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1. **Recitals Incorporated**. The above stated Recitals are incorporated as part of this Agreement as if fully set forth herein.

2. **Membership Interest Purchase**. Subject to the terms and conditions of this Agreement, at the Closing (as defined in Section 10), Seller shall sell, transfer, assign, convey, and deliver to Purchaser, and Purchaser shall purchase from Seller for the consideration herein set forth, all of Seller's right, title, and interest in and to the membership interest in the Company (the "**Membership Interest**"), free and clear of all encumbrances, liens, security interests, pledges, restrictions, or claims of any kind. The conveyance of the Membership Interest shall include all rights associated with Membership interests in the Company generally, including, without limitation, the rights to vote, to share in profits and losses, to share in distributions, and to exercise governance rights in the Company. Seller further acknowledges that by selling the Membership Interests to Purchaser, Purchaser will be receiving all of the Company's right, title and interest to the following (collectively referred to as the "**Property**") :

(a)      The real property, including all right, title, and interest therein, located at 4305 Mercer University Drive, Macon, GA 31206 and 1280 Gray Highway, Macon, GA 31211, and more particularly described on Exhibit A attached hereto (the "**Real Property**").

(b)      All rights, privileges, easements, and rights of way appurtenant to said Real Property, including without limitation, all mineral, oil, and gas and other subsurface rights, development rights, air rights, and water rights (collectively, the "**Appurtenances**").

(c)      All improvements and fixtures located on the Real Property, including, without limitation: (i) all structures affixed to the Real Property; (ii) all apparatus,

equipment, and appliances used in connection with the operation or occupancy of the Real Property; and (iii) all facilities used to provide any services to the Real Property and/or the structures affixed thereto (collectively, the "**Improvements**"), excluding those fixtures owned by Tenants or other occupants of the Property or vendors of the Improvements, if any.

(d)      All tangible personal property located on and used in connection with the Real Property or the Improvements, excluding the personal property of Tenants or other occupants of the Property, if any (collectively, the "**Personal Property**").

(e)      Any service, maintenance, management, commission, union, brokerage, leasing, and other contracts in connection with the Property and all renewals, replacements, extensions of same or additional service contracts that may hereafter be entered into in the ordinary course of business which Purchaser elects to assume in its sole discretion, by written notice to Seller on or before the date that is five (5) days prior to the Closing Date (all such contracts which Purchaser elects to assume, together with any new contracts entered into by Seller in accordance with this Agreement which Purchaser elects to assume, collectively, the "**Assumed Contracts**").

(f)      All rights, warranties, guarantees, utility contracts, approvals (governmental or otherwise), permits, certificates of occupancy, surveys, plans and specifications, trademarks or tradenames, copyrights, and any agreements, covenants, or indemnifications that the Company received from a third party, including any prior owner, and relating to the Real Property, Appurtenances, or Improvements (collectively, the "**Intangible Property**").

(g)      All tenant leases, lease amendments, guarantees, exhibits, addenda, and riders thereto, and any other documents creating a possessory interest in the Real Property or Improvements (collectively, the "**Leases**") with any persons leasing, using, or occupying the Real Property or Improvements or any part of either (collectively, the "**Tenants**").

Notwithstanding anything herein to the contrary, "**Property**" does not include any tenant fixtures or other property belonging to Tenants of the Property, or any item leased from third parties.

**3.**      **Purchase Price**.  The purchase price to be paid by Purchaser to Seller in full consideration for the Membership Interest in the Company (the "**Purchase Price**") shall be Twelve Million Two Hundred Thousand 00/100 U.S. Dollars ($12,200,000.00), subject to such apportionments, adjustments, and credits as are provided in Section 15.  Purchaser shall pay the Purchase Price as follows:

(a)      The sum of One Hundred Thousand and 00/100 Dollars ($100,000.00) (together with any interest earned thereon, collectively, the "**Earnest Money Deposit**"), within three (3) Business Days following the Effective Date, by wire transfer of immediately available funds to the account of First American Title Insurance Company, National Commercial Services, 25 W. Main Street, Suite 400, Madison, WI 53703, Attn: Rachael Schroeder ("**Escrow Agent**").  The Earnest Money Deposit shall be applicable to the Purchase Price at Closing.

(b)     The balance of the Purchase Price, adjusted to reflect prorations and other adjustments pursuant to Section 11, shall be paid to Seller on the Closing Date, simultaneously with the delivery of the Assignment, by federal funds wire transfer of immediately available funds into an account designated by Seller or in such other manner as the Parties may agree.

4.     **Earnest Money Deposit.**

(a) The Earnest Money Deposit shall be held by Escrow Agent and disbursed in accordance with the terms and conditions of this Agreement. Any interest, if any, earned on the Earnest Money Deposit shall be deemed to be part of the Earnest Money Deposit and shall be paid together with the principal portion of the Earnest Money Deposit; provided, however, that if the transaction closes, at the Closing any interest earned on the Earnest Money Deposit shall be credited to Purchaser by applying the same against the Purchase Price.

(b) Subject to Section 4(c), whenever in this Agreement Purchaser is entitled to a return of the Earnest Money Deposit, Purchaser shall be entitled to the return of the Earnest Money Deposit actually being held by Escrow Agent pursuant to this Agreement. Subject to Section 4(d), whenever in this Agreement Seller is entitled to retain the Earnest Money Deposit, Seller shall be entitled to the Earnest Money Deposit actually being held by Escrow Agent to this Agreement.

(c) If Purchaser cancels or terminates this Agreement as in any manner allowed herein pursuant to Section 5, Section 6, Section 19 (b) or Section 21, Escrow Agent shall, within five (5) business days following its receipt of Purchaser's termination notice, remit the Earnest Money Deposit to Purchaser, together with all interest earned thereon, and thereafter the parties shall be released from further liability under this Agreement, except as otherwise provided herein.

(d) If Seller cancels or terminates this Agreement as in any manner allowed herein pursuant to Section 19 (a), Escrow Agent shall, within five (5) business days following its receipt of Seller's termination notice, remit the Earnest Money Deposit to Seller, together with all interest earned thereon, and thereafter the parties shall be released from further liability under this Agreement, except as otherwise provided herein.

5.     **Financing Contingency.** Purchaser and Seller expressly acknowledge and agree that Purchaser's obligations to pay the Purchase Price and otherwise consummate the transactions contemplated hereby are fully conditioned on: (a) Purchaser's ability to obtain an unconditional binding written commitment for financing, whether by way of debt financing, equity investment, or otherwise, on terms acceptable to Purchaser in its sole and absolute discretion; and (b) the funding of such financing, on or before the Closing Date (collectively, the "**Loan Financing**"). If Purchaser does not receive the Loan Financing within twenty-five (25) days after the Effective Date ("**Financing Deadline**"), then Purchaser shall have the right to terminate this Agreement, by giving written notice of Purchaser's election to do so, to Seller on or before the Financing Deadline, which notice should be signed by Purchaser and Seller. If Purchaser elects to terminate this Agreement as provided in this Section 5, Escrow Agent shall return the Earnest Money Deposit to Purchaser, and upon such refund being made this Agreement shall terminate, and the

DocuSign Envelope ID: 408EF033-19C2-46B9-B675-E2B0A8214405

parties shall have no further liability hereunder (except with respect to those obligations hereunder which survive the termination of this Agreement). If Purchaser fails to give notice as provided in this Section 4, Purchaser shall be deemed to have elected to proceed to Closing pursuant to the terms of this Agreement

6.      **Purchaser's Review Period**. **Purchaser Due Diligence Period**. Purchaser shall twenty-five (25) days from the Effective Date, as such may be extended by mutual agreement of the Parties, ("**Due Diligence Period**"), to review the Property (including conducting such tests, studies, surveys, appraisals and/or other physical inspections of the Property as Purchaser deems necessary or appropriate), the Company, the Membership Interests, Tenant's financial condition and business experience, and all information relating thereto (including the Due Diligence Materials as hereafter defined) (the "**Inspections**"). Purchaser's Inspections shall be subject to all rights and obligations placed on Seller by the Current Owner under the Initial Purchase Agreement, and as permitted such inspections may encompass such matters as, without limitation, title and survey (as further provided in Section 7 below), environmental conditions, soil conditions, siting, access, traffic patterns, competition, financing, economic feasibility, platting, zoning, leasing status, and matters involving governmental cooperation. If Purchaser is dissatisfied with the Property, the Company, or the Membership Interests, for any reason or no reason whatsoever, then Purchaser shall have the right to terminate this Agreement upon written notice to Seller delivered at any time prior to 5:00 p.m. central time zone on the last day of the Due Diligence Period. If Purchaser does not so notify Seller of its election to terminate this Agreement prior to 5:00 p.m. central time zone on the last day of the Due Diligence Period, Purchaser shall be deemed to have elected to proceed to Closing, subject to the terms and conditions of this Agreement.

7.      **Due Diligence Review**. From the Effective Date until the Closing, Seller shall, and shall cause the Company to, (a) afford Purchaser full and free access to and the right to inspect all of the Property, properties, assets, premises, books and records, contracts and other documents and data related to the Company; (b) furnish Purchaser with such financial, operating and other data and information related to the Company as Purchaser or any of its Representatives may reasonably request; and (c) instruct the Representatives of Seller and the Company to cooperate with Purchaser in its investigation of the Company. Any investigation pursuant to this Section 6 shall be conducted in such manner as not to interfere unreasonably with the conduct of the business of Seller or the Company. No investigation by Purchaser or other information received by Purchaser shall operate as a waiver or otherwise affect any representation, warranty, or agreement given or made by Seller in this Agreement.

8.      **Representations and Warranties of Seller**. Seller  hereby make the following representations and warranties to Purchaser with the intention that Purchaser may rely upon the same and acknowledges that the same shall survive the Closing of the transaction contemplated hereby:

(a)      This Agreement constitutes the legal, valid, and binding obligation of Seller, enforceable against Seller in accordance with its terms.

(b)      Seller has the full legal capacity, power, and authority to enter into this Agreement and perform the Seller's obligations hereunder, subject to Seller's rights under this Agreement.

(c)     Seller owns the Membership Interest beneficially and of record, free and clear of all encumbrances, liens, security interests, pledges, restrictions, or claims of any kind, except as otherwise stated in the Company's Articles of Organization, Operating Agreement, or Minnesota Limited Liability Company Law.

(d)     Neither the execution and delivery of this Agreement nor the consummation or performance of Seller's obligations hereunder will, directly or indirectly (with or without notice or lapse of time), conflict with, or result in a violation of any laws, regulations, ordinances, or any contract or agreement to which Seller is a party or by which Seller is bound.

(e)     Except as delivered to Purchaser in writing prior to the Effective Date of this Agreement, there are no amendments to the Company's Articles of Organization or Bylaws, and there is no shareholder or similar agreements which bind the owner of the Membership Interest.

9.     **Representations and Warranties of Purchaser**. Purchaser hereby makes the following representations and warranties to Seller with the intention that Seller may rely upon the same and acknowledge that the same shall survive the Closing of the transaction contemplated hereby:

(a)     This Agreement constitutes the legal, valid, and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms.

(b)     Purchaser is a limited liability company formed under the laws of the State of Idaho and has the requisite power and authority to enter into and perform this Agreement.  The person(s) signing this Agreement and Purchaser's closing documents on behalf of Purchaser is authorized to do so and this Agreement constitutes the legal, valid and binding obligation of Purchaser. Purchaser has the requisite power and authority to enter into this Agreement, the Purchaser's closing documents and such documents have been duly authorized by all necessary action on the part of Purchaser and have been or will be duly executed and delivered; and such documents are enforceable against Purchaser in accordance with their terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium, creditor's rights and other similar laws. Neither the execution and delivery of this Agreement nor the consummation or performance of Purchaser's obligations hereunder will, directly or indirectly (with or without notice or lapse of time), conflict with, or result in a violation of any laws, regulations, ordinances, or any contract or agreement to which Purchaser is a party or by which Purchaser is bound.

(c)     In connection with this Agreement, Purchaser has not made any untrue statement of a material fact or omitted to state a material fact required to be stated herein or necessary to make the statement and facts contained herein not false or misleading.

(d)     Purchaser understands that the purchase of the Membership Interest is a speculative investment involving a high degree of risk, but represents that Purchaser has such knowledge and expertise in financial and business matters such that Purchaser is capable of evaluating the merits and risks of the purchase of the Membership Interest and

DocuSign Envelope ID: 408EF033-19C2-46B9-B675-E2B0A8214405

can afford to suffer a complete loss of Purchaser's investment in the Membership Interest.

(e)      Purchaser has had an opportunity to ask questions and to receive answers from representatives of the Company concerning all matters respecting the Company's present and proposed operations and financial conditions, and all questions have been answered to the full satisfaction of Purchaser.  Purchaser has also had the opportunity to review financial and organizational information of the Company, and such other documents and information as Purchaser deems necessary to evaluate the merits and risks of the purchase of the Membership Interest, and understands that the Membership Interest is subject to restrictions under the terms of those instruments.

(f)      Purchaser is purchasing the Membership Interest for Purchaser's own account; Purchaser acknowledges that the Membership Interest has not been registered with the Securities and Exchange Commission, the Wisconsin Department of Financial Institutions, or any other state's securities commission; Purchaser is not acquiring the Membership Interest with a view to dividing, directly or indirectly, Purchaser's interest therein with others; Purchaser has no present intention to sell or otherwise dispose, directly or indirectly, of all or any part of the Membership Interest and will not so act unless and until at some future date changed circumstances not now contemplated make such sale or other disposition advisable; and Purchaser does not have in mind acquiring the Membership Interest for sale or other disposition upon the occurrence of some predetermined event.

**10.**      **Closing**. The closing of the purchase and sale (the "**Closing**") provided for in this Agreement shall take place at a mutually agreed upon location on a date not later than thirty (30) after the expiration of the Due Diligence Period (the "**Closing Date**"), or such other time as mutually agreed by the Parties. The Closing shall take place, unless otherwise agreed to by Seller and Purchaser, by escrow deliveries to the Escrow Agent pursuant to reasonably acceptable escrow instructions that will provide, among other things, that the transfer documents will be released only upon Escrow Agent, on behalf of Seller, being unconditionally and irrevocably authorized to disburse the Purchase Price to Seller or as Seller may direct.  In addition to the other adjournment rights expressly allowed elsewhere in this Agreement, Seller shall have the right to adjourn the Closing to the last Business Day of the month in which the Closing is then scheduled to occur.

**11.**      **Closing Costs.**  The closing costs contemplated by this Agreement shall be paid as follows:

(a)      **Seller Costs:** Seller shall pay (i) one-half (1/2) of any reasonable escrow or closing charge of the Title Company; (ii) all payments, fees and costs related to the satisfaction, release and discharge of any monetary lien (including without limitation mortgages) voluntarily created by Seller, judgements and tax liens against Seller or any Non-Permitted Title Objections voluntarily created by Seller after the date hereof (but in no event shall any such lien or Non-Permitted Title Objection be deemed to include anything related to work for which Purchaser is receiving a credit at Closing), provided , however, that Seller shall in no event be deemed to have voluntarily created (nor shall Seller be liable for) any monetary lien or Non-Permitted Title Objections if caused or

DocuSign Envelope ID: 408EF033-19C2-46B9-B67E-E2B0A821440F

created by an act or omission of Purchaser or other Tenant; (iv), but not the cost of any endorsements to the Title Policy (other than endorsements which Seller obtains to cure any Non-Permitted Title Objection0; and (v) any sales tax payable on the sale of any personal property to Purchaser.

(b)   **Purchaser Costs:** Purchaser shall pay (i) one-half (1/2) of any reasonable escrow or closing charge of the Title Company; (ii) the costs of updating the portions of the Survey applicable to the Property, or any new survey of the Property at Purchaser's election; (iii) all expenses relating to its inspection of the Property including, but not limited to, engineering, environmental and property surveys whether or not Purchase closes title to the Property; (iv) any cost incurred in connection with any financing obtained by Purchase including, without limitation, mortgage recording tax and title insurance premiums; and (v) legal fees for Purchaser's attorney, if any.

1.   **Reimbursement of Transaction Costs to Seller**.  In addition to the costs provided in Section 11(b) above, Seller and Purchaser agree that Seller incurred costs in connection with the acquisition of the Real Property ("**Transaction Costs**"). Further, the Parties agree that Seller purchased the Real Property in contemplation of immediately, or as reasonably feasible thereafter, selling either the Real Property or the interest in Company, as contemplated by this Agreement. As such, Purchaser agrees to reimburse Seller for the following Transaction Costs at Closing:

a.   Commission paid to Seller's broker, Marcus and Millichap, in the amount of $90,000.00;

b.   the cost of the Title Commitment and the premium for the Owner's Policy of title insurance, including endorsements, in the amount of the appraised value of the Property, to be issued to Purchaser by the Title Company in connection with Closing (the "**Title Policy**"), in the total amount of $27,625.00;

c.   the cost of recording the deed(s), including, without limitation, any recording charges imposed by the applicable governmental authority in connection with the recording of the deed, in the total amount of $60.00; and

d.   legal fees in connection with the formation of and filing fees for the Company, as well as the acquisition of the Property, in the amount of $16,300.00.

**12.**   **Apportionments at Closing.** The Parties shall prorate the following as the Closing Date based on the actual number of days of the month which shall have elapsed as of the Closing Date and a 365 day year.

(a)   Fixed rents payable by Tenants which are collected on or prior to the Closing in respect of the month (or other applicable collection period) in which the Closing occurs (the "**Current Month**"), on a *per diem* basis based upon the number of days in the Current Month prior to the Closing Date (which shall be allocated to Seller)

and the number of days in the Current Month on and after the Closing Date (which shall be allocated to Purchaser).

(b)     All other income the Property generates.

(c)     Real property taxes and assessments (including, without limitation, any assessments relating to Permitted Title Exceptions, business improvement district assessments or similar charges), water rates and charges, and sewer taxes not otherwise payable directly to the taxing authority by any Tenant under a Lease, in accordance with following terms: Property taxes shall be apportioned as described in this Section. If the Closing Date shall occur before an assessment is made or a tax rate is fixed for the tax period in which the Closing Date occurs, the apportionment of such Property Taxes based thereon shall be made at the Closing Date by applying the tax rate for the preceding year to the latest assessed valuation. If as of the Closing Date the Property or any portion thereof shall be affected by any special or general assessments which are or may become payable in installments of which the first installment is then a lien and has become payable, Seller shall pay the unpaid installments of such assessments which are due prior to the Closing Date and Purchaser shall pay the installments which are due on or after the Closing Date.

(d)     To the extent not paid by tenants directly, all water, electric, telephone, fuel, and other utility charges based on the last ascertainable bill unless meter readings are made as of the Closing Date, in which case such meter readings shall govern. If the apportionment is not based on an actual current reading, but rather the last ascertainable bill, then upon the taking of a subsequent actual reading (which shall be conducted no later than ten (10) business days following the Closing), the parties shall, within fifteen (15) days following notice of the determination of such actual reading, readjust such apportionment and Seller shall deliver to Purchaser or Purchaser shall deliver to Seller, as the case may be, the amount determined to be due upon such readjustment.

(e)     Any charges or fees for transferable licenses and permits for the Property.

(f)     Any amounts prepaid or payable by the Company under the Assumed Contracts.

(g)     All unapplied Security Deposits and advance rentals in the nature of Security Deposits, if any, which are in the name of the Company on the Closing Date, shall be turned over and assigned to Purchaser at the Closing/In lieu of the Company transferring Security Deposit accounts, there shall be an adjustment at Closing of an amount equal to the aggregate amount of the Security Deposits (with interest as required by applicable law) shown on an updated certified Rent Roll provided by the Seller]. Seller agrees that it will not after the date hereof apply any Security Deposits for any Tenants against the payment of rents thereunder unless any such Tenant vacates.

(h)     All operating costs and expenses accrued before the Closing Date shall be paid by Seller on or before the Closing Date or promptly upon receipt of applicable statements. All operating costs and expenses accruing on or after the Closing Date shall be paid by Purchaser.

No later than three (3) Business Days prior to the Closing Date, Seller and Purchaser shall agree to a schedule of items to be prorated as of the Closing Date and the amounts thereof, and Seller and Purchaser and/or their respective agents or designees will jointly prepare, and at the Closing, Seller and Purchaser shall execute and deliver, a closing statement (the "**Closing Statement**") to the Title Company which will show the net amount due either to Seller or to Purchaser as the result of the adjustments and prorations provided for in this Agreement, and such net due amount will be added to or subtracted from the cash balance of the Purchase Price to be paid to Seller at the Closing pursuant to Section 3(b), as applicable.

13. **Deliveries at the Closing**.

    (a)    At the Closing, Purchaser shall deliver the following to Seller:

        i.    This Agreement, duly executed;

        ii.    The Purchase Price as set forth in Section 3 (as adjusted);

        iii.    The Assignment and Assumption of Membership Interest (the "**Assignment of Membership Interest**") in substantially the form attached hereto as <u>Exhibit B</u>, duly executed, assigning from Seller to Purchaser all of Seller's right, title, and interest in the Membership Interests;

        iv.    A consent of the Purchaser authorizing the transaction contemplated hereby and the execution and delivery of the documents required to be executed and delivered hereunder;

        v.    Such evidence as the Title Company may require as to the authority of the person or persons executing documents on behalf of Purchaser;

        vi.    Closing Statement; and

        vii.    All other documents reasonably necessary to effectuate the transfer contemplated by this Agreement.

    (b)    At the Closing and upon receipt of the deliverables listed in Subsection (a), Seller shall deliver the following to Purchaser:

        i.    This Agreement, duly executed;

        ii.    The Assignment of Membership Interest, duly executed;

        iii.    Originals or, if originals are not in the possession or control of the Seller, copies of all Leases and Assumed Contracts, together with all correspondence related thereto in Seller's possession or under Seller's control;

        iv.    Originals or, if originals are not in the possession or control of the Seller, copies of all plans, specifications, technical manuals, and

similar materials and other documents that are used in the maintenance and operation of the Property;

v.  Originals or, if originals are not in the possession or control of the Seller, copies of all books and records relating to the operation of the Property;

vi.  Originals or, if originals are not in the possession or control of the Seller, copies of all permits and licenses related to the Property;

vii.  All keys, key cards, combinations, and codes relating to the operation of the Property and identification of the locks to which they correspond;

viii.  The Security Deposits, if any;

ix.  Originals or, if originals are not in the possession or control of the Seller, copies of all Organizational Documents of the Company;

x.  Resignations effective as of the Closing Date of any officers or directors and the managers of the Company, if any;

xi.  A consent of the sole member of Seller authorizing the transaction contemplated hereby and the execution and delivery of the documents required to be executed and delivered hereunder.

xii.  Closing Statements;

xiii.  A written certificate stating that all representations and warranties contained in Section 8 remain, as of the Closing Date, true, correct, and complete in all material respects as when first made hereunder (the "**Bring Down Certificate**").

xiv.  All original tenant Estoppel Certificates, if any,

xv.  One original Notice to Tenants, signed by Seller and notifying all Tenants under the Leases of the transfer of beneficial ownership in the Property.

xvi.  All other documents reasonably necessary to effectuate the transfer contemplated by this Agreement.

(d)  Possession of the Property.  Upon completion of the Closing, the Company shall have full and complete possession of the Property, free and clear of all liens and claims other than the Permitted Exceptions.

**14.  Seller Acknowledgment**. Seller hereby acknowledges and agrees as follows: (a) Purchaser has not made any representation, warranty, or agreement to induce the sale of the Membership Interest or otherwise with respect to the transactions contemplated herein, except as specifically set forth in this Agreement; (b) Seller has not relied on any representation by the

DocuSign Envelope ID: 4085F033-19C2-46B9-B675-52B0A9214485

Purchaser as to the fair market value of the Membership Interest; (c) Seller has determined that the Purchase Price for the Membership Interest represents fair and adequate consideration; (d) Purchaser has not made any representation or warranty concerning the tax consequences of the sale of the Membership Interest by Seller; (e) the payment of any such tax imposed on Seller as a result of the sale of the Membership Interest shall be the responsibility of Seller; and (f) Seller has had the opportunity to consult with and to obtain advice from such legal, tax, and other advisors as Seller has deemed appropriate and that the agreement to purchase the Membership Interest herein contained constitutes the free and informed decision of Seller.

15.   **Purchaser Acknowledgment**. Purchaser hereby acknowledges and agrees as follows: (a) neither Seller nor the Company has made any representation, warranty, or agreement to induce the sale of the Membership Interest or otherwise with respect to the transactions contemplated herein, except as specifically set forth in this Agreement; (b) Purchaser has not relied on any representation by Seller or the Company as to the fair market value of the Membership Interest; (c) Purchaser has determined that the Purchase Price for the Membership Interest represents fair and adequate consideration; (d) neither Seller nor the Company has made any representation or warranty concerning the tax consequences of the purchase or subsequent disposition of the Membership Interest by Purchaser; (e) the payment of any such tax imposed on Purchaser as a result of the purchase of the Membership Interest shall be the responsibility of Purchaser; (f) Purchaser has had the opportunity to consult with and to obtain advice from such legal, tax, and other advisors as Purchaser has deemed appropriate and that the agreement to purchase the Membership Interest herein contained constitutes the free and informed decision of Purchaser.

16.   **Release**. Following the Closing, Purchaser and the Company shall use all commercially reasonable efforts to have Seller released from all personal liability of Seller for the debts and obligations of the Company (the "**Company Obligations**"), including, without limitation, unconditional releases of Seller's personal liability under any accounts, leases, licenses, rental agreements, loans, and financing transactions of the Company guaranteed by Seller or otherwise imposed upon Seller based upon his status (or former status) as an officer, Seller, agent, or representative of the Company, in each case to the extent Purchaser has received notice of the existence of Seller's personal liability on such Company Obligations. In the event Purchaser and the Company cannot effectuate a release of the Company Obligations, then each of Purchaser and the Company hereby agrees, jointly and severally, for itself and its successors and assigns, to defend, indemnify, and hold harmless Seller free of and against any claim, charge, damage, deficiency, assessment, suit, loss, cost, or expense, including reasonable attorneys' fees, suffered or incurred by or imposed upon Seller and arising out of or relating to the Company Obligations.

17.   **Indemnification**.

(a)   Purchaser and the Company shall jointly and severally defend, indemnify, and hold harmless Seller and successors, assigns, heirs, executors, administrators, representatives, and agents (collectively, the "**Seller Parties**") from and against any and all losses, damages, liabilities, costs, and expenses, including reasonable attorneys' fees, incurred by Seller and the Seller Parties by reason of or arising out of or in connection with (a) the breach or inaccuracy of any representation or warranty of Purchaser and the Company contained in this Agreement, except to the extent Seller caused such

representation or warranty of the Company to be inaccurate or had reason to know any such representation or warranty of the Company was inaccurate; (b) the failure of Purchaser and the Company to perform any covenants, agreements, or conditions required by this Agreement to be performed by either of them, except to the extent the failure of the Company to perform any covenants, agreements, or conditions required by this Agreement is a result of action or inaction of Seller; or (c) the services and business activity conducted by, and liabilities incurred by, the Company after the Closing Date.

(b)     Seller shall defend, indemnify, and hold harmless Purchaser and the Company, and their respective successors, assigns, heirs, executors, administrators, representatives, and agents (collectively, the "**Purchaser Parties**") from and against any and all losses, damages, liabilities, costs, and expenses, including reasonable attorneys' fees, incurred by such Purchaser, the Company, and the Seller Parties by reason of or arising out of or in connection with (a) the breach or inaccuracy of any representation or warranty of Seller contained in this Agreement; or (b) the failure of Seller to perform any covenants, agreements, or conditions required by this Agreement to be performed by Seller.

**18.**     **Commissions and Fees.**  Seller and Purchaser each represent and warrant to the other that it has not dealt with any real estate broker, salesperson, agent or finder in connection with this Agreement and the transaction herein contemplated.  Purchaser agrees to indemnify, defend and save Seller harmless from the claims or demands of any other real estate broker, salesperson, agent or finder claiming to have dealt with Purchaser.  Seller agrees to indemnify, defend and save Purchaser harmless from the claims or demands of any other real estate broker, salesperson, agent or finder claiming to have dealt with Seller. Such indemnities shall include, without limitation, the payment of all costs, expenses and attorneys' fees incurred or expended in defense of any such claims or demands, whether such costs, expenses or attorneys' fees shall include litigation expenses and whether such expenses shall be at trial or appellate levels.

**19.**     **Remedies.**

(a)     In the event Purchaser fails to perform its obligations pursuant to this Agreement for any reason except failure by Seller to perform hereunder or the permitted termination hereof by Purchaser or Seller in accordance with the express provisions of this Agreement, Seller may either (i) waive the default by Purchaser and proceed to Closing without adjustment to the Purchase Price, (ii) terminate this Agreement upon by giving fifteen (15) days' written notice to Purchaser identifying the underlying default by Purchaser, after which, if such underlying default remains uncured, this Agreement will terminate and upon such termination, the Earnest Money Deposit shall be shall be forfeited and paid to Seller as liquidated damages and not as a penalty, or (iii) pursue any other remedy available at law or equity.

(b)     If Seller defaults under this Agreement, Purchaser will have the right to terminate this Agreement by giving fifteen (15) days' written notice of termination to Seller identifying the underlying default by Seller, after which, if such underlying default remains uncured, this Agreement will terminate, and upon such termination, the Earnest Money Deposit will be refunded to Purchaser.  In lieu of terminating this Agreement,

Purchaser's sole remedy shall be to maintain a suit for specific performance of this Agreement.

**20.     Risk of Loss.**

(a)     If improvements are located upon the Property, and in the event of "minor" loss or damage [being defined for the purpose of this Agreement as damage to the Property such that the Property could be repaired or restored, in the certified opinion of Seller's architect, to a condition (the "prior condition") substantially identical to that of the Property immediately prior to the event of damage at a cost equal to or less than $50,000.00], this Agreement shall remain in full force and effect provided Seller causes Current Owner to perform any necessary repairs prior to the Closing, or, at Seller's option, reduces the Purchase Price in an amount equal to the cost of such repairs in which event Seller shall retain all of Seller's right, title and interest to any claim and proceeds Seller may have with respect to any casualty insurance policies relating to the Property.

(b)     In the event of a "major" loss or damage (being defined as any loss or damage which is not "minor" as defined hereinabove), Purchaser shall have the option of either:  (a) terminating this Agreement by notice to Seller and receiving a refund of the Earnest Money Deposit; or (b) proceeding with the Closing, provided Seller shall assign all of the Seller's right, title and interest to any claims and proceeds Seller may have with respect to any casualty insurance policies relating to the Property.

(c)     Upon the Closing, full risk of loss with respect to the Property shall pass to Purchaser as owner of the Company.

**21.     Condemnation.** In the event, at any time on or prior to the Closing Date, any action or proceeding is filed, under which the Property, or any portion thereof, may be taken pursuant to any law, ordinance or regulation or by condemnation or the right of eminent domain, Seller shall promptly give written notice thereof (which notice shall describe the type of action being taken against the Property, and which portions of the Property will be affected thereby) to Purchaser.  If the taking would substantially prevent the Purchaser from continuing the existing use of the Property, then the Purchaser shall have the right to terminate this Agreement by written notice to Seller no later than the earlier to occur of ten (10) days following the date upon which Purchaser receives Seller's written notice of such action or proceeding or the day prior to the Date of Closing and the Earnest Money Deposit shall be returned to Purchaser.  If Purchaser does not elect to so terminate this Agreement by such deadline, this Agreement shall remain in full force and effect and the parties shall proceed to closing without any reduction or adjustment in the Purchase Price, except that all condemnation proceeds will be assigned to Purchaser.

**22.     Resignation.** With respect to any and all positions or offices held by Seller in or with respect to the Company, including as an employees, governor, managers, or officers, Seller hereby confirms that it has resigned from such positions or offices and, to the extent Seller has not so resigned, Seller hereby resigns from any and all positions or offices as of the Closing Date.

[32406-35700/3018345/1]

DocuSign Envelope ID: 408FF033-19C2-46B9-B635-52B0A9214485

23.     **Further Assurance**. At any time and from time to time after the Closing, each Party shall, upon request of the other Party, execute, acknowledge, and deliver all such further and other assurances and documents, and will take such action consistent with the terms of this Agreement, as may be reasonably requested by the other Party to carry out the transactions contemplated herein and to permit each Party to enjoy its rights and benefits hereunder.

24.     **Survival**. Each and all of the representations, warranties, covenants, and obligations contained in this Agreement shall survive the Closing.

25.     **Notices**. All notices and other communications required under this Agreement shall be in writing, given at the addresses noted below, and shall be deemed to have been given (a) when received if given in person; (b) on the date of transmission if sent electronically by facsimile or email if transmission is completed no later than four p.m. CT on a business day; or (c) three (3) days after being deposited in the U.S. mail, first-class or registered mail, postage prepaid.

To Purchaser:          FLS Business Center, LLC
                       4195 Chino Hills Parkway
                       Chino Hills, CA 91709
                       edwardmylett@yahoo.com

To Seller:             Matthew Onofrio
                       c/o Northwoods Management LLC
                       2602 Jeanne Lane
                       Eau Claire, WI 54703
                       onofriomatt@gmail.com


with a copy to:        Eckberg Lammers, P.C.
                       430 Second Street
                       Hudson, WI 54016
                       Attn: Ashley Kemplin-Gamm
                       akemplin-gamm@eckberglammers.com

26.     **Governing Law**. This Agreement shall be governed by the laws of the State of Minnesota, with any action or proceeding with respect to this Agreement venued or heard in the State of Minnesota.

27.     **WAIVER OF JURY TRIAL. THE PARTIES WAIVE THE RIGHT TO TRIAL BY JURY IN ANY JUDICIAL PROCEEDING TO WHICH ANY PARTIES TO THIS AGREEMENT ARE INVOLVED AND WHICH DIRECTLY OR INDIRECTLY IN ANY WAY ARISES OUT OF, IS RELATED TO, OR IS CONNECTED WITH THIS AGREEMENT OR THE RELATIONSHIP ESTABLISHED HEREUNDER, WHETHER ARISING OR ASSERTED BEFORE OR AFTER THE DATE OF THIS AGREEMENT.**

28.     **Amendment**. No purported amendment, modification, or waiver of any provision in this Agreement shall be binding unless set forth in a written document signed by the Parties (in the case of amendments or modifications) or by the Party to be charged thereby (in the case

DocuSign Envelope ID: 4085F033-19C2-46B9-B67E-52B0A9214485

of waivers), and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

29.    **Waiver**. No failure on the part of any Party to exercise or delay in exercising, and no course of dealing with respect to, any right, power, or privilege under this Agreement shall operate as a waiver thereof; nor shall any single or partial exercise of any right, power, or privilege under this Agreement preclude any other or further exercise thereof or the exercise of any other right, power, or privilege.

30.    **Entire Agreement**. This Agreement and the Assignment of Membership Interest represent and contain the entire understanding of and all agreements between the Parties concerning the subject matter hereof and supersede all prior and contemporaneous agreements and understandings, written or oral. This Agreement shall not be construed against any Party based upon grounds that the Party drafted this Agreement but shall be construed as if the Parties jointly prepared this Agreement.

31.    **Binding Effect; Successors and Assignability**. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective heirs, legal representatives, successors, assigns, and transferees. Purchaser may not assign its rights, title and interest in and to this Agreement without written notice to Seller not less than three (3) days prior to the Closing Date and Seller's written consent. In the event of any assignment pursuant to this section, such proposed assignee shall expressly assume prior to such assignment in a written agreement delivered to Seller all of the obligations of Purchaser. Any such assignment shall not release Purchaser from any of its obligations or liability under this Agreement, including the obligation to pay the Purchase Price at Closing and to indemnify Seller in accordance with the terms hereof. Both Seller and Company shall, upon written request from Purchaser, execute and deliver in favor of Purchaser's assignee any and all Closing deliverables required to be provided to Purchaser pursuant to Section 14(b), including but not limited to the Assignment of Membership Interest, subject to the limitations set forth above. The provisions of this Section shall survive the Closing or the termination of this Agreement.

32.    **Severability**. Whenever possible, each provision of this Agreement shall be interpreted to be effective and valid under applicable law, but, if any provision of this Agreement shall be held to be prohibited, unenforceable, or invalid in any jurisdiction under such applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

33.    **Headings**. Section headings provided herein are strictly for ease of reference and shall not be used to interpret, expand, or limit the provisions of this Agreement.

34.    **Counterparts**. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one in the same Agreement.

[Signature Page Follows]

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed as of the day first written above.

**SELLER:**

Northwoods Management LLC

By: Matt Onofrio
Its: President

**PURCHASER:**

FLS Business Center, LLC

By:  Edward Mylett III
Its:  Member

By:   Kristianna Mylett
Its:  Member

[Signature Page to Membership Interest Purchase Agreement of 4315 Pine Warbler Properties LLC]

## EXHIBIT A

## Description of Real Property

ALL THAT TRACT OR PARCEL OF LAND LYING AND BEING IN LAND LOT 112 OF THE 4TH LAND DISTRICT IN BIBB COUNTY, GEORGIA AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

Commence at a point being at the northeasterly miter of the intersection of the westerly right-of-way of Log Cabin Drive (50' R/W) and the northerly right-of-way of Mercer University Drive (R/W varies);

THENCE along said right-of-way of Mercer University Drive, South 58 degrees 24 minutes 26 seconds West for a distance of 45.12 feet to a point;
THENCE North 78 degrees 11 minutes 18 seconds West for a distance of 102.53 feet to a point;
THENCE North 78 degrees 33 minutes 40 seconds West for a distance of 89.92 feet to a point;
THENCE North 79 degrees 46 minutes 28 seconds West for a distance of 3.53 feet to a concrete right-of-way monument;
THENCE North 08 degrees 53 minutes 07 seconds East for a distance of 10.30 feet to a 1/2 -inch rebar set;
THENCE North 86 degrees 54 minutes 45 seconds West for a distance of 82.73 feet to a point;
THENCE departing the said right-of-way of Mercer University Drive, North 01 degree 41 minutes 08 seconds East for a distance of 25.61 feet to a point, said point being the POINT OF BEGINNING;
THENCE, from said POINT OF BEGINNING, North 01 degrees 41 minutes 08 seconds East for a distance of 104.38 feet to a 1/2-inch rebar found;
THENCE South 88 degrees 14 minutes 49 seconds East for a distance of 9.90 feet to a 1/2 -inch rebar set;
THENCE North 01 degree 41 minutes 08 seconds East for a distance of 86.98 feet to a 1/2-inch rebar found;
THENCE South 88 degrees 24 minutes 09 seconds East for a distance of 270.87 feet to a point;
THENCE South 00 degrees 51 minutes 40 seconds West for a distance of 196.01 feet to a 1/2 -inch rebar set;
THENCE South 45 degrees 54 minutes 06 seconds West for a distance of 19.43 feet to a 1/2 -inch rebar set;
THENCE North 36 degrees 44 minutes 19 seconds West for a distance of 7.22 feet to a 1/2 -inch rebar set;
THENCE South 53 degrees 15 minutes 35 seconds West for a distance of 19.68 feet to a 1/2-inch rebar set;
THENCE South 36 degrees 44 minutes 26 seconds East for a distance of 7.88 feet to a 1/2-inch rebar set;
THENCE South 51 degrees 20 minutes 16 seconds West for a distance of 17.14 feet to a 1/2-inch rebar set;
THENCE North 78 degrees 11 minutes 08 seconds West for a distance of 152.66 feet to a 1/2-inch rebar set;
THENCE North 11 degrees 48 minutes 58 seconds East for a distance of 7.62 feet to a 1/2-inch rebar set;
THENCE North 78 degrees 10 minutes 58 seconds West for a distance of 19.68 feet to a 1/2 -inch rebar set;
THENCE South 11 degrees 48 minutes 58 seconds West for a distance of 7.62 feet to a 1/2-inch rebar set;
THENCE North 78 degrees 11 minutes 16 seconds West for a distance of 24.16 feet to a 1/2-inch rebar set;
THENCE along a curve to the left, a length of 49.10 feet with a radius of 1005.61 feet, being subtended by a chord bearing North 79 degrees 35 minutes 11 seconds West for a distance of 49.09 feet to a 1/2-inch rebar set and the Point Of Beginning.

PARCEL 1:

ALL THAT TRACT OR PARCEL OF LAND LYING AND BEING SITUATED IN LAND LOT 38 OF MACON RESERVE EAST, MACON, BIBB COUNTY, GEORGIA, SAID TRACT OR PARCEL OF LAND CONTAINING 71,764 S.F. OR 1.647 ACRES, MORE OR LESS. ANO BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS, TO WIT:

COMMENCING AT A CONCRETE MONUMENT FOUND MARKING THE INTERSECTION OF THE SOUTHERLY RIGHT-OF-WAY LINE OF SHURLING DRIVE (100'R/W) ANO THE WESTERLY RIGHT-OFWAY LINE OF GRAY HIGHWAY (GA. HWY 11,22,49; U.S. HWY 129; 88'R/W), SAID CONCRETE MONUMENT BEING THE POINT OF REFERENCE; THENCE, ALONG SAID SOUTHERLY RIGHT-OF-WAY LINE OF SHURLING DRIVE S89°31'14"W, 138.18' TO A 1/2" REBAR SET AND THE POINT OF BEGINNING; THENCE, LEAVING SAID RIGHT-OF-WAY LINE. S00°15'41"W 122.21' TO A 1/2" REBAR SET; THENCE S30°54'27"E, 21.68' TO A1/2" REBAR SET; THENCE, N59°44'19"E. 18.25' TO A1/2" REBAR SET; THENCE, S30°15'41'"E, 37.95' TO A COTTON SPINDLE SET AT THE POINT OF CURVATURE OF A CURVE TO THE RIGHT HAVING A RADIUS OF 56.50', ARC LENGTH OF 45.83', CHORD BEARING OF S06°59'59"E, AND CHORD LENGTH OF 44.63', TO A 1/2" REBAR SET; THENCE, S30°43'00E, 7.77' TO A 1/2" REBAR FOUND LOCATED ON THE WESTERLY RIGHT-OF-WAY LINE OF GRAY HIGHWAY (STATE ROUTES 11, 22, 49; U.S. HWY. 129; 88' R/W); THENCE, ALONG SAID WESTERLY RIGHT-OF-WAY LINE, S27°16'09'"W, 77.74' TO A 1/2" REBAR SET ON SAID RIGHT-OFWAY LINE; THENCE, CONTINUING ALONG SAID RIGHT-OF-WAY LINE OF GRAY HIGHWAY, S27°13'24"W, 139.03' TO A 1/2" REBAR SET; THENCE, LEAVING SAID RIGHT-OF-WAY LINE OF GRAY HIGHWAY, N30°22'34'"W, 237.10' TO A 1/2" REBAR SET; THENCE, N30°22'34"W 166.90', TO A 1/2" REBAR SET; THENCE N47°28'34"W, 76.10' TO A COTTON SPINDLE ON THE SOUTHERLY RIGHT-OF-WAY LINE OF SHURLING DRIVE; THENCE, ALONG SAID SOUTHERLY RIGHT-OF-WAY LINE OF SHURLING DRIVE, N86°37'20"E, 81.12' TO A 1/2" REBAR SET; THENCE, CONTINUING ALONG SAID SOUTHERLY RIGHT-OF-WAY LINE OF SHURLING DRIVE, N88°42'17"E, 155.95' TO A PK NAIL & CAP SET IN AN ASPHALT DRIVE; THENCE, CONTINUING ALONG SAID RIGHT-OF-WAY LINE, S89°50'46"E, 67.83' TO THE POINT OF BEGINNING.

PARCEL 2:

EASEMENTS AND OTHER INTERESTS IN REAL PROPERTY CONTAINED IN THAT CERTAIN NONEXCLUSIVE
EASEMENT FROM STATE OF GEORGIA, ACTING BY AND THROUGH THE STATE
PROPERTIES COMMISSION TO SED-GRAY, LLC, A MICHIGAN LIMITED LIABILITY COMPANY, DATED NOVEMBER 4, 2005, FILED FOR RECORD DECEMBER 5, 2005, AND RECORDED IN DEED BOOK 6874, PAGE 165, AFORESAID RECORDS.

**END OF LEGAL DESCRIPTION**

[32406-35700/3018345/1]

## EXHIBIT B

### Assignment of Membership Interest

This **ASSIGNMENT OF MEMBERSHIP INTEREST** (this "**Assignment**") is made and entered into effective as of _____, by and between Northwoods Management LLC, a Minnesota limited liability company ("**Assignor**") and FLS Business Center, LLC, an Idaho limited liability company (collectively the "**Assignee**").

**WHEREAS**, Assignor is the sole member of 4315 Pine Warbler Properties LLC, a Minnesota limited liability company (the "**Company**");

**WHEREAS**, Assignor desires to sell, assign, convey, and transfer all of his membership interest in the Company (the "**Membership Interest**") to Assignee pursuant to the terms and conditions set forth in that certain Membership Interest Purchase Agreement dated _____, **2022** by and among Assignor, Assignee, and the Company (the "**Membership Interest Purchase Agreement**"); and

**WHEREAS**, Assignee desires to purchase and accept the Membership Interest pursuant to the terms and conditions set forth in the Membership Interest Purchase Agreement.

**NOW, THEREFORE**, in consideration of the Purchase Price (as defined in the Membership Interest Purchase Agreement), the receipt and sufficiency of which is acknowledged, the parties agree as follows:

1.      Assignor hereby irrevocably and unconditionally sells, assigns, conveys, and transfers to Assignee, all right, title, and interest of Assignor in and to the Membership Interest. Assignor agrees to be responsible for all obligations with respect to the Membership Interest that accrued before the date hereof.

2.      In order to induce Assignor to enter into this Assignment and to sell, assign, convey, and transfer the Membership Interest, Assignee represents and warrants to Assignor that Assignee is acquiring the Membership Interest for his own account and not with a view for resale or distribution thereof within the meaning of the Securities Act of 1933, as amended (the "**Securities Act**"), and that it will not sell, assign, convey, or transfer the Membership Interest in contravention of the Securities Act.

[Signature Page Follows]

**IN WITNESS WHEREOF**, the parties hereto have executed this Assignment, effective as of the date first above written.

ASSIGNOR:                                          ASSIGNEE:

**Northwoods Management LLC**                      **FLS Business Center, LLC**


_____        _____
By: Matthew Onofrio                                By:  Edward Mylett III
Its: President                                     Its:  Member


                                                   _____
                                                   By:  Kristianna Mylett
                                                   Its:  Member


[Signature Page to Assignment of Membership Interest/4315 Pine Warbler Properties LLC]

### CONSENT OF 4315 PINE WARBLER PROPERTIES LLC

The undersigned, constituting all of the members of 4315 Pine Warbler Properties LLC, hereby acknowledge and confirm that the Company consents to the foregoing assignment by a unanimous vote of its members.

Dated:

<div style="margin-left: 40%;">

**4315 PINE WARBLER PROPERTIES LLC MEMBERS:**

**Northwoods Management LLC**

_____

Name: Matthew Onofrio
Its: President

</div>

[32406-35700/3018345/1]